UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| SYBIL WILLIAMS and, | ) | |
| JOSH NORWOOD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 1:12-CV-108 SNLJ |
| | ) | |
| FORD MOTOR CO., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM

This matter is before the Court on defendant Ford Motor Company's Motion for Summary Judgment  (#24) and Motion to Exclude the Opinion Testimony of Plaintiffs' Expert John Huffman (#22), both filed May 1, 2013.  The motions have been fully briefed and are now ripe for disposition.

I.    **Case Summary**

The following facts are undisputed, except where indicated.  The plaintiffs' decedent, Steven Williams, was killed while jump starting a 1999 Ford Taurus sedan in the course of his employment with Dixie Auto Sales, Inc. ("Dixie").  Defendant Ford Motor Co. ("Ford") manufactured the vehicle, and Bufford Dirt Cheap Auto Sales, Inc. ("Bufford") had, a month before the accident, sold the used vehicle to Dixie under "as is" terms of sale.[1]

On March 24, 2008, Mr. Williams was using a screwdriver to jump start the car by connecting the two terminals of the starter solenoid; by doing so, Mr. Williams bypassed the

---

[1]Bufford was previously named as a defendant in this case, which was then No. 1:10cv57.  Because Bufford's presence in the case destroyed diversity, this matter was remanded to state court.  Bufford is no longer a defendant, and Ford thus removed this case back to this Court.

functioning Transmission Position Switch ("TPS") which is partly designed as a safety switch that prevents operators from starting the vehicle unless the vehicle's transmission is in Neutral or Park. The car started in a Drive gear and ran over Mr. Williams, which resulted in his death.

As of the date of the accident, the Taurus's gear shifter could move from position to position, but moving the shifter did not result in any change of gear selection.  The transmission remained in the same gear that it was in (apparently a Drive gear) regardless of the shifter's position.  Upon inspection, it was discovered that the Taurus's gear shift cable had become loose from the transmission, which permitted the gear shifter itself to move freely without actually shifting the car's gears.  The gear shift cable connects to the transmission with a plastic-like clip (the "shift actuator cable fitting") and a metal bracket.  The parties agree that, sometime before the accident, the transmission and engine had both been replaced with components from a different vehicle.

Ford's experts testified that, probably during the course of the removal and replacement of the transmission and engine, the metal shift cable bracket had been bent.  Then, as a result, the shift cable was improperly assembled to the shift cable bracket, and the bent bracket caused the shift cable to be improperly secured.  As a result, the shift cable became loose, which allowed the shift selector lever to move freely between gear positions and prevented the transmission from being placed into Park.

Plaintiffs' expert, John Huffman, testified that the shift actuator cable fitting and the shift cable itself were defective, causing the car to be in an unknown gear.  Mr. Huffman opined that the "plastic" clip used to hold the cable to the bracket was defectively designed, that it should have been a nut and bolt or other more robust fastener.  Ultimately, plaintiffs state that their expert concluded that "the cause of the accident was the gear shift indication on the dashboard showing

2

park when the vehicle was actually...in drive, and that occurred because the shift cable was not properly retained to its bracket."  At his deposition, Mr. Huffman testified that the bracket did not appear bent when he examined it, but he agreed that he would have no reason to dispute that the bracket was, in fact, bent.

The first owner of the Taurus traded the car in and observed that the car's "service engine" light had been on at least three times during his ownership, and that the light had been on for two weeks when he traded the car in.  At some point in the car's history, the car was owned by Ford Motor Credit, a wholly-owned subsidiary of Ford, and former defendant Bufford purchased the car from Ford Motor Credit before selling it "as is" to Dixie.

## II.    Legal Standard

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. *New England Mut. Life Ins. Co. v. Null*, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *Mt. Pleasant v. Associated Elec. Coop. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962). The burden is on the moving party. *Mt. Pleasant*, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita*

*Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

With these principles in mind, the Court turns to the discussion.

## III.    Discussion

Plaintiffs brought two claims against Ford: (1) defective product, and (2) failure to warn of a defective and unreasonably dangerous condition.  Ford seeks summary judgment on both claims.  Notably, Ford brought a motion for summary judgment before the state court as well, and the state court denied that motion; however, neither party opines on the effect of the state court summary judgment denial.  Because that denial of summary judgment was an interlocutory order, however, it may be reconsidered at any time.  *See Myers v. Moore Engineering, Inc.*, 42 F.3d 452, 455 (8th Cir. 1994).  In addition, according to plaintiffs, Ford's motion before this Court relies on additional argument not presented to the state court.

### A.    Defective or Unreasonably Dangerous Product

Plaintiffs' complaint does not articulate whether their product liability claim is brought under strict liability or negligence theories, but the parties have proceeded as though plaintiffs'

4

claim is brought solely under strict liability.  The parties also agree that Missouri law applies to plaintiffs' claims.

To recover on a strict liability theory for an allegedly defective product, a plaintiff must establish that: (1) the defendant sold the product in the course of its business; (2) the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use; (3) the product was used in a manner reasonably anticipated; and (4) plaintiff was damaged as a direct result of such defective condition as existed when the product was sold.  *Jasinski v. Ford Motor Co.*, 824 S.W.2d 454, 455 (Mo. Ct. App. 1992); *Jones v. Ryobi, Ltd.*, 37 F.3d 423, 424 (8th Cir. 1994) (applying Missouri law).

The fourth element — causation — is at issue here.  Plaintiffs must prove that their "injury was the direct result of a defect that existed when the product was sold."  *Leonard v. Bunton Co.*,  925 F. Supp. 637, 642 (E.D. Mo. 1996).  Further, plaintiffs have the burden of proof to show that "the product was defective at the time it entered into the stream of commerce and that neither [they] nor any third person has made alterations to the product that would create a defect that could be the proximate cause of the damages incurred."  *Boyer v. Bandag, Inc.*, 943 S.W.2d 760, 763 (Mo. Ct. App. 1997); *see also Jones*, 37 F.3d at 424; *Jasinski*, 824 S.W.2d at 455; *Williams v. Deere & Co.*, 598 S.W.2d 609, 612 (Mo. Ct. App. 1980).  However, "[s]ubsequent changes or alterations in a product do not relieve the manufacturer of strict liability if the changes were foreseeable and did not render the product unsafe."   *Boyer*, 943 S.W.2d at 763 .

Ford argues that the accident was caused by the bent bracket and subsequent improper assembly of the shift cable, which is a condition that did not exist at the time of the Taurus's manufacture.  Plaintiffs state that the design of the shift actuator fitting (the "plastic clip" that

5

held the shift cable to the bracket) was the cause of the accident.   Thus plaintiffs contend they have at least raised a question of material fact.  Plaintiffs, who, again, have the burden to show there had been no alterations to the vehicle that could have caused the accident, make four arguments in support of their position that summary judgment should be denied.  Each is discussed below.

### 1.        Whether the bracket was bent.

Plaintiffs dispute even that the bracket was bent.  However, they do not support their dispute with any citation to evidence.  Notably, their expert, Mr. Huffman, did not notice that the bracket was bent when he inspected the car, but and does not affirmatively opine that the bracket was intact.  Indeed, he agreed that he has no reason to dispute that the bracket was bent.  Accordingly, this is not a genuine issue of material fact.  Further, as discussed below, Mr. Huffman's testimony will be excluded from evidence.

### 2.        Whether Ford was responsible for the bent bracket.

Plaintiffs respond that even if the bracket had been bent, it might have occurred when Ford Motor Credit repossessed the vehicle or during assembly (nearly 10 years before the accident).  As to the possibility that Ford Motor Credit possessed the vehicle when the modifications were made, that argument is a red herring: Ford Motor Credit is a separate legal entity from the defendant Ford Motor Company, and Ford Motor Credit is not a party to this

lawsuit.[2]  Plaintiffs suggest that one of Ford's dealers may have caused the bent bracket, but, again, Ford dealers are separate legal entities, and no Ford dealership is a party to this case.

As for whether the bracket was bent during assembly of the vehicle — nine years before the accident — Ford's experts state that the modifications and bent bracket occurred after the car left Ford's control, probably when the engine and transmission were replaced.  Plaintiffs have not cited any deposition testimony, discovery responses, or affidavits to support that a genuine dispute exists here.  The only testimony cited by plaintiffs to support that the bracket was bent during assembly is that of the vehicle's former owner, who testified that he took the car to a Ford dealership after the check engine light came on, and that he understood that the check engine light came on because he had failed to tighten the gas cap.   But the former owner also testified that, in the 25,000 miles he drove the car, he had never had trouble with the car's shifting mechanism.[3]  Regardless, even plaintiffs seem to argue that the original owner's testimony "leads

---

[2]Plaintiffs' argument that a parent corporation is responsible for the acts of its wholly-owned subsidiary, without more, is contrary to black letter law.  *See, e.g. H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1549 (8th Cir. 1989) (declining to hold parent corporation responsible for acts of wholly-owned subsidiary where parent company did not act or influence subsidiary and where there was no evidence that subsidiary was a "mere instrumentality or alter ego of" or "sham corporation formed to shield" parent).

[3]Plaintiffs characterize the former owner's testimony as follows: "The initial owner of the car testified that he traded the car because the check engine light kept coming on and [a Ford dealership] could not fix it." The Court disagrees with that characterization.  The former owner was asked whether there was "any particular reason" he traded it in, and he testified, "No. I...usually try to trade the vehicles in before the warranty is up, but this particular [vehicle's] red light was on.  It was on for maybe...two weeks, because I couldn't get it into [the dealership service department] because they were on strike.  That's how I remember when I traded the vehicle."   Thus, the former owner clearly said that there was no particular reason he traded the vehicle in, except that he usually does so before the warranty is up; he just happened to recall that, on that occasion, the check engine light had been on for some time because the service department was on strike.  The former owner testified that, at the time, he had driven the car approximately 25,000 miles, which indicates that the bracket was not bent at the time of the car's assembly.

7

to an inference that the engine may have been replaced by Ford itself through one of its dealers," which, as discussed above, does not support plaintiffs' position.  Even viewed in a light most favorable to plaintiffs, those facts do not support any inference that the bracket was bent at the time the car left Ford's control.

### 3.   Whether there was "substantial change" to the vehicle.

Even if the bracket was bent, plaintiffs argue it was not a "substantial change" to the vehicle such that the manufacturer may avoid strict liability.  Plaintiffs rely on *Williams*, which observed that "[s]trict liability in tort does not require that the product be new at the time of the occurrence but that it be in substantially the same condition as when it left defendant."  598 S.W.2d at 612.  In *Williams*, the plaintiff was injured when a tractor he was operating moved unexpectedly after plaintiff had put the tractor's gearshift lever into "Park."  However, there was evidence sufficient to show that the tractor was in substantially the same condition when plaintiff was injured as when the tractor left the manufacturer.  *Id.* at 613.  As a result, the Missouri Court of Appeals determined that the plaintiff had made a submissible case under his strict liability theory.  *Id.*  Here, in contrast, plaintiffs have not shown that the Taurus was in substantially the same condition as when it left Ford's plant.  Although plaintiffs maintain that the bent bracket could not have been a "substantial" change because Ford's expert acknowledged that the problem caused by the bent bracket could have been remedied with baling wire or a ziptie, that a simple solution existed is not dispositive.

Plaintiffs attempt to argue that the changes do not relieve Ford of strict liability because they were foreseeable and did not render the Taurus unsafe.  *See Boyer*, 943 S.W.2d at 763 .  Plaintiffs assert, for example, that the car operated safely "long after the [engine] replacement,"

8

(#32 at p.6), but plaintiffs offer no support for such a statement.[4]  Regardless, even if the engine replacement was foreseeable, the improper assembly of the shift cable to the bent bracket was not, and such improper maintenance certainly rendered the vehicle unsafe.

### 4.      Plaintiffs' causation theory

Ultimately, it is undisputed that the engine and transmission had been removed and replaced, and plaintiffs have done nothing to counter Ford's experts' opinions that an unknown person improperly assembled the shift cable to the bent bracket after the car left the manufacturer.  Rather, as the Court understands plaintiffs' argument, they rely on their own causation theory.  Their different causation theory, however, does not relieve them of their burden to show that no third person made alterations that could have been the proximate cause of the accident. *Boyer*, 943 S.W.2d at 763; *Jones*, 37 F.3d at 424; *Jasinski*, 824 S.W.2d at 455; *Williams*, 598 S.W.2d at 612.  Even if they could overcome that burden, the Court holds that they cannot make a submissible case to the jury on their own causation theory, either.

Plaintiffs contend that a design defect — not the bent bracket/improper assembly caused by the unknown third party — caused the accident.  Without identifying how the shift cable became loose, plaintiffs argue that a better design would have prevented the cable from becoming loose under any circumstances.  They state specifically that the Taurus's shift cable actuator *fitting* was defective because it "should have been designed not to come off" when the Taurus's engine was replaced.  (Am. Cmplt. ¶ 7(C).)   Plaintiffs offer the testimony of their expert, John Huffman, in support.  This argument fails, however, because of the necessary disqualification of Mr. Huffman's testimony pursuant to Federal Rule of Evidence 702, *Daubert*

---

[4]Indeed, no one seems to know when the engine was replaced or when the Taurus last operated correctly.

*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150-151 (1999) (discussing application of *Daubert* factors to "experienced-based" expert testimony).

This Court must act as a "gatekeeper" to "insure that proffered expert testimony is both relevant and reliable." *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006) (quoting *Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003)); *see also Daubert*, 509 U.S. at 589. Federal Rule of Evidence 702 governs the standard for this Court's admission of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Supreme Court set forth in *Daubert* a nonexhaustive list of factors for the Court's consideration as gatekeeper: "(1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has been generally accepted." *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008) (citing *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001)). "Subsequent cases have proposed additional factors, including, whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Sappington*, 512 F.3d at 449 (quoting *Lauzon*, 270 F.3d at 686-87).

10

Mr. Huffman opines that the "plastic" clip used to hold the gear shift cable to the bracket was defectively designed and that it should have been a nut and bolt or other more robust fastener. Ford argues that Mr. Huffman is not qualified as an expert in the relevant field, does not assist the trier of fact, and does not provide a trustworthy opinion.

As to Mr. Huffman's qualification as an expert, although he is a mechanical engineer, he has no significant experience with transmissions or even automotive engineering. Mr. Huffman states that his general mechanical engineering experience and that his work on his personal vehicles qualifies him as an expert, but this Court cannot agree. He has worked on some cars, including rebuilding a 1967 Ford Mustang while in high school and replacing parts on his and his children's vehicles, but he has never even worked on a 1999 Ford Taurus nor any other model year Taurus. Mr. Huffman's expertise — as revealed by plaintiffs' argument at Document Number 31 — is limited to heating and air conditioning, refrigeration systems on vending machines, heating and cooling equipment for industrial use, electric heating systems, and thermodynamics and heat transfer in aircraft cooling. Mr. Huffman may very well be qualified to testify as an expert in those areas of engineering, but expertise related to heating and cooling systems does not necessarily carry over to automotive transmissions. Mr. Huffman's heating and cooling systems experience, his teaching experience, and his patents may provide him with specialized knowledge, but that particular knowledge —  having nothing directly to do with automotive transmissions and linkages — would not "help the trier of fact to understand the evidence or to determine a fact in issue" in this case as required by Rule 702.

Moreover, as shown below, even if Mr. Huffman were qualified, his testimony is not reliable. Mr. Huffman's opinion regarding an alternative design for the shift actuator fitting has not been tested. He did not test it himself, and it has not been subjected to peer review or for

11

publication. He did not utilize any peer-reviewed materials or publications pertaining to the fitting's design in formulating his opinion.

Because there was no testing, the Court cannot know the known or potential rate of error for Mr. Huffman's theory, such as unforeseen complications that may arise, and, it follows from the above analysis that there can be no general acceptance of Mr. Huffman's theory from experts in this field.  Although not dispositive, Mr. Huffman's proposed design was prepared solely for this litigation, and it is not used for any passenger vehicles.  On the contrary, Ford provides evidence that *its* fitting (which is not "plastic" but actually glass-filled nylon) has been extensively tested and used in 50 million vehicles around the country.  Finally, Mr. Huffman did not speak with witnesses or review depositions for this case in formulating his opinion, and he did not know that the transmission and engine had been removed from the Taurus and replaced.  And the fact that Mr. Huffman did not realize that the transmission and engine had been replaced, nor notice that the bracket was bent, indicates that he did not rule out alternative explanations before concluding that the design of the fitting was to blame.

In addition, it is not clear that Mr. Huffman's opinion is that the design of the fitting more likely than not was the cause of the accident. Notably, Mr. Huffman did not produce a written report.  His "notes to file" did not reflect any defect in the design of the vehicle, but, rather, he formulated his opinions "in the course of reviewing [his] notes to file in preparation for deposition" and shared those opinions for the first time at his deposition.  (Doc. 22-4 at 75.)  He testified as follows:

Q.  So as we sit here today, do you know what caused this accident?

A.  In my opinion, the cause of the accident was the gear shift indication on the dashboard showing park when the vehicle was actually – transmission was actually in drive, and that occurred because the shift cable was not properly retained to its bracket.

12

Q.  As far as -- as far as a shift cable not being properly attached to the bracket, are you saying that that's because of the fitting?

A.  I believe it's because of the shift actuator cable fitting, the plastic part.

Q. Okay. And tell me again what -- what evidence you have to base your opinion upon that the shift actuator cable fitting failed?

A. I don't know for certain that it failed.

Q. Okay.

A. I believe it's possible that it could based on the design.

Q. And is it also possible that it could not have failed?

A. That's possible.

(#22-4 at 84-85.)  Thus, Mr. Huffman's opinion appears to be that he believes it is merely *possible* that the fitting could have failed based on its design.  Ultimately, it appears that Mr. Huffman's opinions "amount to no more than 'subjective belief or unsupported speculation.'"  *Weisgram v. Marley Co.*, 169 F.3d 514, 521 (8th Cir. 1999) *aff'd*, 528 U.S. 440 (2000) (quoting *Daubert*, 509 U.S. at 590).

Plaintiffs argue that Ford's criticisms of Mr. Huffman go to the weight of his testimony, not admissibility.  But this Court is required to act as a gatekeeper to prevent just this sort of testimony from reaching the jury.  The Court will exclude Mr. Huffman's testimony pursuant to *Daubert*, *Kumho*, and Rule 702.  Plaintiffs have offered no other evidence (expert or otherwise) to support their claim that the Taurus suffered from a defective design that caused the accident.

Here, the plaintiffs are not able to make a submissible case for a jury regarding causation.  Again, "[i]f plaintiff produces evidence that there were no alterations to the product which would create a defect that could be the proximate cause of the damages incurred, he makes a submissible case as to the existence of the defect at the time of sale." *Williams*, 598 S.W.2d at 613.  Because

13

they have no evidence that a design defect caused the accident, even if plaintiffs could meet their burden to show that a third party's alterations "could be the proximate cause" of the accident, *id.*, summary judgment will be granted to Ford on plaintiffs' product liability claim.

### B.     Failure to Warn

Next, plaintiffs contend that Ford should have warned "of the danger of the [shift cable actuator fitting] being damaged" during the replacement of the Taurus's engine.  (Am. Cmplt. ¶ 7.)  To prevail under a failure to warn claim brought under strict liability, the plaintiffs must prove (1) the defendant sold the product in the course of defendant's business; (2) the product was unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics; (3) the defendant did not give adequate warning of the danger; (4) the product was used in a manner reasonably anticipated; and (5) the plaintiff was damaged as direct result of the product being sold without an adequate warning. *Church v. Martin-Baker Aircraft Co., Ltd.*, 643 F. Supp. 499, 508-9 (E.D. Mo. 1986).

Ford contends that it is entitled to summary judgment on plaintiffs' failure to warn claim. As with a products liability claim, causation is a required element of failure to warn claims: plaintiffs must prove both that the product for which there was allegedly no warning caused injury, and "that a warning would have altered the behavior of [those] involved in the accident." *Mothershead v. Greenbriar Country Club, Inc.*, 994 S.W.2d 80, 89 (Mo. Ct. App. 1999); *Arnold v. Ingersoll Rand Co.*, 834 S.W.2d 192, 194 (Mo. 1992) (en banc).  If either causation element is not present, summary judgment is appropriate.  *Mothershead*, 994 S.W.2d at 89.

Plaintiffs, despite their denial of the bent bracket with respect to the design defect claim, focus on Ford's alleged lack of a warning to the unidentified mechanic who was responsible for bending the bracket when the engine/transmission were replaced.  Citing *Moore v. Ford*, 332

14

S.W.3d 749, 762 (Mo. 2011), plaintiffs argue that if such a warning had been given by Ford, then "it can be assumed it would have been heeded and the bracket not bent."  However, in *Moore*, the court states that "plaintiffs must show that a warning would have altered the behavior of the *individuals involved in the accident*."  *Id.* (emphasis added) (citing *Arnold*, 834 S.W.2d at 194). And, in *Moore*, the presumption was that the plaintiffs (who were involved in the accident) would have heeded the warning.  The presumption therefore does not apply to the unidentified mechanic. There is no testimony or evidence in this case that any warning would have altered any individual's behavior in this case.  Moreover, the "heeding presumption" to which plaintiffs claim they are entitled applies only if plaintiffs can show that "there is sufficient evidence from which a jury could find that the [responsible party] did not already know the danger."  *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 13 (Mo. 1994); *see also Arnold*, 834 S.W.2d at 194.  "[T]he burden is on plaintiffs to show that lack of knowledge."  *Arnold*, 834 S.W.2d at 194.  Here, plaintiffs have made no effort to carry that burden.  It is clear that plaintiffs cannot satisfy the causation prong of their failure to warn claim.  As a result, summary judgment is appropriate.

## IV.      Conclusion

In sum, Ford's Motion to Exclude the Opinion Testimony of Plaintiffs' Expert John

Huffman (#22) will be granted, and Ford is entitled to summary judgment on plaintiffs' claims.

A separate order and judgment will issue.

Accordingly,

**IT IS HEREBY ORDERED** that Ford's Motion to Exclude the Opinion Testimony of

Plaintiffs' Expert John Huffman (#22) is **GRANTED**.


Dated this  25th  day of July, 2013.


STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE

16